UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DAVID M. PARKER,

Plaintiff,

v. Case No. 5:07-cv-230-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant.
_______________________________________/

**ORDER**

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for Disability Insurance Benefits and Supplemental Security Income. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 9 and 10.) For the reasons discussed below, the Commissioner's decision is due to be

**AFFIRMED.**

## I. PROCEDURAL HISTORY

On February 24, 2004, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, alleging a disability onset date of December 30, 2001, due to low back pain and Wolff-Parkinson-White Syndrome. (R. 44-46, 335-350.) Plaintiff's application was denied at the initial and reconsideration level and a request for a hearing before an Administrative Law Judge ("ALJ") was timely filed and later held on May 3, 2006. (R. 23-29, 343-350, 351-397.) The ALJ issued an unfavorable decision for Plaintiff on November 14, 2006. (R. 12-18.) Plaintiff's request for a review of the

hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 5-8.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5] The law

---

[1] See 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long

---

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work").

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born in May 1964 and was 42 years old at the time of the hearing. (R. 18, 44.) Plaintiff attained a high school equivalency education and has past relevant work experience as a grocery store clerk, automobile technician, and an automobile air conditioning technician. (R. 17, 65.) Plaintiff contends that he has been unable to work since December 30, 2001 due to lower back pain and Wolff-Parkinson-White syndrome, a heart condition. (R. 64.)

On February 19, 2002, Plaintiff experienced shortness of breath, chest tightness and heart palpitations and was treated at Munroe Regional Medical Center. An electrocardiogram conducted during that visit suggested that Plaintiff had Wolff-Parkinson-White syndrome. (R. 127-128.) However, a cardiac catheterization and chest x-ray revealed normal results. (R. 125, 129-131.)

On June 28, 2002, Plaintiff was again seen at the hospital with multiple episodes of pre-syncope and heart palpitations. (R. 119.) A second electrocardiogram

---

[19] Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

confirmed the "classic changes of Wolff-Parkinson-White syndrome" and his medication was increased. (R. 120-121.) However, pulmonary functioning tests reveled no significant obstruction. (R. 253.) On July 23, 2002, Plaintiff underwent a successful "radiofrequency ablation of a posterior left atrial accessory pathway." (R. 267.)

Approximately two years passed before Plaintiff was seen for additional medical care. (R. 143.) On March 23, 2004, Plaintiff saw Dr. Shetty, an internal medicine physician. At this appointment, Plaintiff reported that three to four months after the ablation procedure his palpitations had returned which caused him to feel dizzy. In May of 2004, an intracardiac doppler study revealed a left ventricular diastolic abnormality and Dr. Swaroop K. Rai diagnosed Plaintiff as "status post ablation for Wolff-Parkinson-White syndrome and recurrent sinus tachycardia[22] with unclear etiology. (R. 160,168.)

On May 24, 2004, Dr. Dantuluri Raju, conducted a physical examination on the Plaintiff at the request of the Division of Disability determinations. (R. 274-277.) In that evaluation, Dr. Raju confirmed the diagnosis of Wolff-Parkinson-White syndrome with post radio ablation and frequent symptoms of palpitations. (R. 277.) Although Dr. Raju noted a history of fainting, he indicted that the reason for fainting was not clear from Plaintiff's history.

In June of 2004, Plaintiff went to Ocala Regional Medical Center with an episode of tachycardia and mild chest pain. (R. 289.) An electrocardiogram revealed sinus tachycardia. The chest x-ray disclosed that Plaintiff's lungs were clear and there was a silhouette within normal limits and no active disease in the chest. (R. 290, 292.) The

---

[22] Tachycardia is defined as relating to a rapid heart rate originating in the sinus mode. STEDMAN MEDICAL DICTIONARY 1931 (28th ed. 2006).

progress record discloses that Plaintiff's medications were increased. (Id.)

Two state agency non-examining physicians completed residual functional capacity assessments. In June of 2004, a non-examining physician determined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, that he could sit, stand and walk about six hours during an eight hour work day, he could occasionally climb, but could frequently balance, stoop, kneel, crouch or crawl, and should avoid unprotected heights or moving machinery. (R. 279-285.) A second non-examining physician made similar findings and noted that Plaintiff's Wolff-Parkinson-White disease had been effectively treated. However, the cause of the sinus tachycardia was undetermined. Lastly, the non-examining physician stated that there were no findings in the record regarding the Plaintiff's back complaints.

Plaintiff then saw Dr. Nasser, a cardiologist, on December 6, 2004. (R. 159.) During that appointment, Dr. Nasser recorded Plaintiff's complaints of chest pain, palpitations, dyspnea and one episode of syncope. (R. 159.) Plaintiff was given a Holter heart rhythm monitor to wear so Dr. Nasser could have the benefit of a study of Plaintiff's heart to determine the cause of his complaints. The results of the December 13, 2004, Holter heart rhythm monitor study were normal. (R. 165.) On two occasions, Dr. Nasser noted that based upon an evaluation of Plaintiff's vitals the Plaintiff was not taking his medications regularly. (R. 157, 159.) Later that month, Dr. Nasser noted that Plaintiff's complaints of multiple episodes of arrhythmia and palpitations were not supported by the findings from the Holter heart rhythm monitor study, which did not show any abnormal rhythms. (R. 157.) On May 25, 2005, Dr. Nasser noted in his progress notes that Plaintiff had "an element of non-compliance and being fixated with

open heart surgery as a curative measure ... [and that as a result Plaintiff's] judgment has been hampered." (R. 158.)

Plaintiff continued to receive treatment from Dr. Nasser and approximately one year later, Plaintiff wore an event monitor, which recorded frequent episodes of supraventricular tacharrhythmias.[23] (R. 154.) Dr. Nasser noted that Plaintiff's medications had been restarted because the medications controlled Plaintiff's symptoms very well. Dr. Nasser recommended that Plaintiff be evaluated for a second ablation procedure. Plaintiff was, however, reluctant to receive treatment from Shands Hospital and his lack of insurance limited other treatment options. (R. 154.) In August of 2005, Dr. Nasser noted that the "frequency of this abnormality...will limit him in performing his daily routine job." (R. 154.)

In April of 2005, Plaintiff was referred to Dr. Miguel Bryce, a cardiologist for an electrophysiology evaluation to determine whether Plaintiff has a true arrhythmia, and if so, the kind of arrhythmia Plaintiff is experiencing. Dr. Bryce noted that Plaintiff's symptomatology did not correlate with arrhythmia. Accordingly, because recent test results were normal, Dr. Bryce requested that Plaintiff undergo additional testing to record the heart rhythm. (R. 301-302.) Plaintiff did not have the additional testing performed.

In December of 2005, Plaintiff returned for treatment with Dr. Nasser. (R. 325-326.) Plaintiff reported to Dr. Nasser that he had experienced 50-60 episodes of syncope attacks within the last year. Dr. Nasser's progress notes disclose that Dr.

---

[23] Supraventricular tachycardia is defined as rapid heart rate originating above the ventricular level. STEDMAN MEDICAL DICTIONARY 1931 (28th ed. 2006).

Nasser was suspicious of the seriousness and extent of Plaintiff's complaints. In this regard Dr. Nasser noted that he had "gradually begun to doubt [Plaintiff's] truthfulness" as he believed Plaintiff had "...an ulterior motive." (R. 325.) Dr. Nasser's skeptical view of Plaintiff's complaints was based upon "the Holter dated 12/2004 [which] had been normal, and event monitor recorded for a duration of one month [which showed] essentially sinus tachycardia with a significant...artifact in the background which is suspicious for the patient's exertion activity recorded as rapid heart rate." (Id.) Dr. Nasser concluded that "unfortunately Plaintiff's symptoms remain ambiguous and they are not consistent with events." (Id.) In Dr. Nasser's plan and recommendations he states:

> "his episodes recorded on the event monitor are not consistent with atrial fibrillation with rapid ventricular response, atrial flutter, atrial tachycardia or true AV reentrant tachyarrhythmias. Episodes of tachycardia are not associated with widening or QRS which could be representing presence of a concealed...at this time. His baseline electrocardiogram also does not demonstrate presence of a delta wave or any conduction abnormalities." (R. 326.)

In addition to providing these medical records, Plaintiff testified on his own behalf at the evidentiary hearing. (R. 351-397.) Plaintiff acknowledged that he was not receiving treatment for his back problems and had not had an x-ray or MRI in 20 years. (R. 373.) Plaintiff described his symptoms to include palpitations in the chest, dizziness, shortness of breath, light-headedness and passing out. (R. 380-383.)

On August 24, 2006, Linda S. Bojarski, Psy.D., a clinical psychologist, performed a consultative examination. (R. 327-330.) Dr. Bojarkski, noted that Plaintiff performed mental control exercises quickly and without error and he was fully oriented during the evaluation. Plaintiff's achievement tests showed high school level reading and average

to superior memory skills. Plaintiff reported that his activities of daily living included shopping, cooking, spending time with friends, doing yard work, laundry, and housework. Dr. Bojarski noted that personality testing suggested that Plaintiff was a person who converts stress into physical symptoms and resists psychological explanations for problems. (R. 330.) Dr. Bojarski's diagnostic impression was an undifferentiated Somatoform Disorder and nicotine dependence. (Id.) She also noted that according to the Plaintiff, he experiences lower back pain on average at a level two and with excessive activity, his pain level is at a four or five. (R. 328.) As a result of the evaluation, Dr. Bojarksi found no functional limitations related to Plaintiff's mental impairment.

The ALJ found that Plaintiff had the severe impairment of Wolff-Parkinson-White syndrome (R. 14), but declined to find that Plaintiff suffered from a severe back impairment or from a severe mental impairment. (R.16.) The ALJ found that Plaintiff had the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, he could sit, stand and walk about six hours in an eight hour workday, occasionally climb, but frequently balance, stoop, kneel, crouch or crawl, but should avoid unprotected heights or moving machinery. The ALJ determined that Plaintiff's residual functional capacity did not preclude the performance of his past relevant work and concluded that Plaintiff was not disabled. (R. 16-18.)

## IV. <u>DISCUSSION</u>

Plaintiff raises three issues in his appeal. Plaintiff first argues that the ALJ erred by rejecting Plaintiff's credibility without examining all of the evidence. Secondly, Plaintiff argues that the ALJ erred by failing to discuss whether Plaintiff could work on a regular

and continuing basis. Finally, Plaintiff argues that the ALJ erred in finding that Plaintiff could perform his past relevant work.

The Court will first turn to Plaintiff's argument that the ALJ erred in rejecting Plaintiff's credibility without examining all of the evidence. In evaluating a disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[24] Where, as here, an ALJ decides not to credit a claimant's testimony about subjective complaints concerning the intensity, persistence and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[25] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[26]

The ALJ articulated specific reasons for rejecting Plaintiff's credibility as to the limiting effects of his symptoms, which reasons are supported by substantial evidence in the record. These reasons include the following.

First, the ALJ discussed and relied upon the medical evidence from Dr. Nasser, Plaintiff's primary cardiologist, who noted that Plaintiff's symptoms did not correspond with objective medical evidence. Dr. Nasser found that Plaintiff's "...episodes recorded on the event monitor are not consistent with atrial fibrillation with rapid ventricular

---

[24] 20 C.F.R. § 404.1528.

[25] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[26] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

response, atrial flutter, atrial tachycardia or true AV reentrant tachyarrhythmias...[h]is baseline electrocardiogram also does not demonstrate presence of a delta wave or any conduction abnormalities." (R. 326.) Moreover, despite the fact that Plaintiff complained of multiple episodes of arrhythmia and palpitations, these symptoms were not supported by the results of two Holter monitor studies, neither of which evidenced any abnormal rhythms. (R. 157, 165.)

The ALJ also relied upon the fact that Dr. Nasser, Plaintiff's own treating cardiologist, did not find Plaintiff's complaints to be credible. Dr. Nasser noted in his progress notes that he "had gradually began to doubt [Plaintiff's] truthfulness" as he believed Plaintiff had "...an ulterior motive." (R. 325.) Dr. Nasser's doubts were well founded in the test results and medical evidence. After evaluating Plaintiff and reviewing test results Dr. Nasser stated that "unfortunately Plaintiff's symptoms remain ambiguous and they are not consistent with events." (R. 301.) Dr. Nasser concluded that the "event monitor recorded for a duration of one month evidenced sinus tachycardia with a significant...artifact in the background which is suspicious for the patient's exertion activity recorded as rapid heart rate." (R. 325.)

In addition to the fact that the event monitor did not record frequent episodes of supraventricular tacharrhythmias Dr. Nasser further observed that Plaintiff was not being compliant with his medications, which medications had controlled his symptoms well. (R. 154.) Dr. Nasser concluded that Plaintiff's "judgment has been hampered" as an " element of non-compliance and being fixated with open heart surgery as a curative measure." (R. 158.)

The ALJ also discussed and relied upon the medical evidence from Dr. Miguel

Bryce, who examined Plaintiff upon referral from Dr. Nasser for an electrophysiology evaluation. Dr. Bryce did not identify any major issues and noted that Plaintiff had a normal sinus rhythm on an electrocardiogram and Holter monitor with no supraventricular ectopic beats. (R. 301.)

In addition to relying upon the medical record from treating sources, the ALJ discussed the assessment of the state agency medical experts in assessing Plaintiff's credibility. The ALJ gave great weight to the state agency examiners and stated that their findings were consistent with the objective medical evidence of record and were not contradicted by any treating source. This finding is accurate because at a minimum the opinions of the state agency medical experts are consistent with and do not contradict the opinions of Dr. Nasser, Plaintiff's primary cardiologist, or Dr. Bryce.

In further assessing Plaintiff's credibility and consistent with the requirements of SSR 96-7p,[27] the ALJ appropriately discussed Plaintiff's activities and treatment. The ALJ relied upon the fact that Plaintiff enjoys visiting with friends, going out to eat and that he is able to perform all activities of daily living independently. (R. 329.) Additionally, the ALJ noted that Plaintiff is able to engage in leisure activities and is capable of performing household chores, such as, shopping, cooking, laundry, yard work, and some housework and driving. (R. 329-330, 367.) Plaintiff also is able to drive as evidenced by the fact that he drove himself to his psychological evaluation. (R. 327.)

---

[27] S.S.R. 96-7p (In addition to the objective medical evidence, when assessing the credibility of an individual's statement, the adjudicator must consider, the individual's daily activities; location, duration, frequency and intensity of the pain or symptoms; factors that aggravate the symptoms; effectiveness and side effects of medication to alleviate the pain or symptoms; treatment; any measures the individual uses to relieve pain or symptoms; and any other factors concerning the individual's functional limitations due to pain or other symptoms.

The ALJ determined that these activities of daily living were inconsistent with Plaintiff's claims of the limiting effects of his symptoms. (R. 17.) Lastly, the ALJ relied upon and considered the fact that Plaintiff had a "two year gap in treatment during the period he alleges he was disabled" and that during that period he worked "about 20 weeks." (R. 16, 374.)

In making his credibility determination and consistent with the application of SSR 96-7p, the ALJ also appropriately took into account the fact that Plaintiff's compliance with his medications has been questionable. (R. 16.) On at least two occasions, Dr. Nasser noted that Plaintiff has a history of noncompliance with taking his medications. (R. 157, 159.) The ALJ also took into account that although the Plaintiff reported some fatigue as a side effect from one of the medications, the evidence did not suggest that the fatigue was extreme or occurred on a persistent basis.(R. 162, 301.) Notably, the medical evidence suggested - and Plaintiff confirmed in his testimony - that the medications did help to stop the rapid heart rate. (R. 384.)

In addition to thoroughly evaluating Plaintiff's cardiac issues relating to the Wolff-Parkinson-White syndrome, the ALJ evaluated Plaintiff's complaints of a back impairment. The ALJ properly determined that Plaintiff's subjective complaints of a back impairment were not supported by the record. In making this determination the ALJ relied upon the fact that there was no medical evidence nor any laboratory findings confirming the presence of a back impairment. Indeed, Plaintiff testified that his back pain had not been diagnosed and that he had not had an MRI or an x-ray "...in the last twenty years." (R. 328, 374.) Plaintiff further acknowledged that he had not been receiving treatment for his back problems and had only been treated by a chiropractor

several times. (R.373.) Plaintiff further admitted that it was possible for him to function at a lighter or sedentary type job (R. 374) and that his average pain level was a "two" on a zero to ten scale. (R. 328.) Finally, Plaintiff described his medications to be "short term" and rated his most severe pain at a four or five, with excessive activity. (Id.)

Accordingly, for these reasons, the Court concludes that the ALJ articulated specific and adequate reasons, which are fully supported by the evidence of record, for rejecting Plaintiff's subjective complaints of back pain.

Lastly, in evaluating Plaintiff's credibility the ALJ discussed and relied upon the consultative evaluation by Dr. Bojarski and did not, as Plaintiff suggests, fail to consider Dr. Bojarski's diagnosis of Somatoform disorder. The ALJ clearly stated in his decision that "the psychologist [Dr. Bojarski] found evidence of a Somatoform disorder on personality testing." (R. 17.) Dr. Bojarski noted that Plaintiff's clinical profile suggested a person who converts stress into physical symptoms and lacks insight into the causes of their symptoms and resists psychological explanations of their problems. (R. 330.) The ALJ took this into account but properly relied upon the fact that Dr. Bojarski did not find any functional limitations related to the Somatoform disorder. (R. 15, 331-333.)

Accordingly, the Court concludes that the ALJ followed SSR 96-7p in assessing Plaintiff's RFC and in finding that Plaintiff's subjective complaints were not credible. The ALJ discussed and appropriately relied upon objective medical evidence, Plaintiff's testimony, his non-compliance with medications, the fact that there was a two year gap in treatment, the medical evidence from both treating and consultative physicians, and the consultative psychological evaluation. Accordingly, the ALJ did not err in rejecting Plaintiff's credibility. The ALJ's credibility finding was well articulated and was supported

by the medical evidence of record.

Plaintiff next argues that the ALJ erred at step four of the sequential evaluation by failing to discuss whether Plaintiff could work on a regular and continuing basis, as required by Social Security Ruling 96-8p. Social Security Ruling 96-8p provides that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific material facts and non-medical evidence.[28] The ALJ must also discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.[29] A "regular and continuing basis" means eight hours a day, five days a week, or the equivalent work schedule.[30]

Contrary to Plaintiff's contention that the ALJ did not discuss whether Plaintiff could work on a regular and continuing basis, in his decision, the ALJ specifically found that Plaintiff had the ability "to lift and carry fifty pounds occasionally and twenty-five pounds frequently, and that he could, sit, stand, and walk about six hours during an eight-hour workday." (R. 16.) In making this assessment, the ALJ discussed: (1) Plaintiff's testimony; (2) Plaintiff's symptoms; (3) the objective medical evidence; (4) the opinion of the state agency consultants; (5) Plaintiff's treating sources; and (6) Plaintiff's activities of daily living. (R. 16-17.) Moreover, the ALJ noted that there was a gap in Plaintiff's medical treatment during the time that Plaintiff claims that he was disabled. It

---

[28] S.S.R 96-8p.

[29] Id.

[30] Id.

is, therefore, abundantly clear that the ALJ considered Plaintiff's ability to work throughout an eight hour day and considered Plaintiff's ability to work longitudinally over a regular and continuous period of time.

Plaintiff next argues that the ALJ erred by failing to take into account Plaintiff's Somatoform disorder, fatigue, and back impairment in his assessment of Plaintiff's RFC. The ALJ, of course, is required to consider every impairment and the combined effect of those impairments.[31] The ALJ did so here.

As discussed at length above, in his decision, the ALJ thoroughly considered and discussed Plaintiff's impairments of Wolff-Parkinson-White syndrome and his claimed impairments of fatigue, back pain, and Somatoform disorder.[32] Indeed, there is no doubt that the ALJ considered all of the impairments in view of the express statement by the ALJ that he "considered all symptoms..." in making the residual functional capacity finding. (R. 16.)

Plaintiff next argues that the ALJ failed to give proper weight to the opinion of Plaintiff's treating physician and instead improperly relied upon the opinion of the non-examining physicians. In according "great weight" to the assessments of the state agency medical consultants the ALJ explained that these assessments were consistent with the objective evidence of record and were not contradicted by the opinions of any other treating source. (R. 17.) This finding is supported by the substantial record evidence.

---

[31] Gibson v. Heckler, 779 F.2d 619, (11th Cir. 1986).

[32] In addition to these conditions, the ALJ discussed Plaintiff's fractured left toe, which was treated with ice and hard-soled shoes. (R. 15.)

For example, one of the non-examining state agency physicians noted that Plaintiff's Wolff-Parkinson-White disease had been effectively treated and the cause of the sinus tachycardia was undetermined. (R. 298.) These findings are consistent with the opinions and the medical records from Plaintiff's treating cardiologist, Dr. Nasser, and Dr. Bryce. Therefore, contrary to Plaintiff's suggestion, the ALJ's decision to accord "great weight" to the assessments by the state agency consultants is fully supported by substantial record evidence.

Plaintiff's last argument is that the ALJ erred in failing to perform a functional analysis of Plaintiff's past relevant work and to compare it to Plaintiff's existing capabilities as required by SSR 82-62. Plaintiff bears the burden of proving that he cannot perform his past relevant work either as he performed it or as it is generally performed in the national economy.[33] SSR 82-62 provides that the determination of whether a claimant has the capacity to perform a past relevant job should include the following specific findings: (1) the individual's RFC, (2) the physical and mental demands of the past job/occupation, and (3) that the individual's RFC would permit a return to his or her past job or occupation.[34]

In making the determination that Plaintiff had the capacity to perform his past relevant work, the ALJ appropriately applied the requirements of SSR 82-62. As previously discussed, the ALJ clearly made findings regarding the Plaintiff's RFC. Secondly, the ALJ considered Plaintiff's testimony and used corroborative information,

---

[33] Doughty v. Apfel, 245 F.3d 1274 (11th Cir. 2001).

[34] S.S.R. 82-62.

such as the Dictionary of Occupational Titles[35] in addressing the physical and mental demands of Plaintiff's past job/occupation.

For example, the ALJ stated that Plaintiff "primarily did training and operated diagnostic equipment..." and that "...he was right handed and had no problems with his hands." (R. 17, 375.) In finding that Plaintiff could perform his past relevant work as a grocery clerk, as generally performed, the ALJ pointed to the DOT, which classified grocery clerk as light exertional level work. At step four of the sequential analysis the claimant must prove that he is unable to perform his job as he performed it and as the job is generally performed in the national economy. Because the ALJ found that Plaintiff could perform the job of grocery clerk as generally performed in the national economy, and as specified in the DOT, any shortcoming by the ALJ in failing to address the physical and mental demands of Plaintiff's job as he actually performed it - or any error with regard to the finding that Plaintiff could perform his past job as an automobile technician - would not make any difference because a finding of not disabled is required if the Commissioner concludes that the Plaintiff could perform any one past job as the job is generally performed. Thus, even if Plaintiff was unable to perform his job as a grocery clerk as he actually performed it and was unable to perform any of his other past relevant work, the finding that Plaintiff could perform the job of grocery clerk as generally performed is sufficient to support the ALJ's conclusion at step four of the sequential evaluation that Plaintiff is not disabled because he can perform past relevant work.

---

[35] S.S.R. 82-61. (Provides, in part, that the Dictionary of Occupational Titles (DOT) descriptions can be relied upon to define the job as it is usually performed in the national economy).

## V. CONCLUSION

In view of the foregoing and for the reasons discussed above, the decision of the Commissioner is due to be **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 12, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:
Counsel of Record